The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: January 16, 2025

**No. A-1-CA-40664**

**STATE OF NEW MEXICO ex rel.
WESLEY and JESSICA BIGNEY,
NORBERT BARCENA, BETTY
BIRNER, and PAMELA LEE HAINES,**

Plaintiffs-Appellees,

v.

**CITY OF RIO RANCHO, a municipal
corporation; and HAROLD'S GRADING
& TRUCKING, INC.,**

Defendants-Appellants,

and

**CITY OF RIO RANCHO, and municipal
corporation,**

Cross-Claimant,

v.

**HAROLD'S GRADING & TRUCKING,
INC.,**

Cross-Defendant.

**APPEAL FROM THE DISTRICT COURT OF SANDOVAL COUNTY
James A. Noel, District Court Judge**

Cadigan Law Firm, P.C.
Michael J. Cadigan
Albuquerque, NM

for Appellees

NM Local Government Law, LLC
David M. Wesner
Kenneth J. Tager
Albuquerque, NM

for Appellant City of Rio Rancho

Adams+Crow Law Firm
Arlyn G. Crow
Amanda K. Nelson
Albuquerque, NM

for Appellant Harold's Grading & Trucking, Inc.

# OPINION

**WRAY, Judge.**

{1}      Wesley and Jessica Bigney, Norbert Barcena, Betty Birner, and Pamela Lee Haines (collectively, Plaintiffs) brought this land use and takings case against Defendants Harold's Grading & Trucking, Inc. (HGT) and the City of Rio Rancho (the City). The district court found that HGT's operations on the land at issue caused a public nuisance, contrary to NMSA 1978, Section 30-8-1 (1963) and entered a permanent injunction. A jury later returned a verdict for Plaintiffs, in relevant part, on inverse condemnation claims against the City and additional claims against HGT. HGT seeks to reverse the district court's public nuisance determination and to lift or modify the district court's permanent injunction. The City separately appeals from the district court's posttrial order requiring payment of Plaintiffs' attorney fees and requested costs and argues that (1) statutory attorney fees should not be available for inverse condemnation claims; (2) the attorney fee award is unreasonable and violates Article IX, Section 14 of the New Mexico Constitution (the Antidonation Clause); and (3) the cost award is not supported by law.

{2}      We conclude that substantial admissible evidence supported the district court's determination that HGT has unreasonably interfered with a public right and that HGT's consistent failure to obtain the necessary authority to conduct and ensure the proper oversight of its operations otherwise affects the interests of the

community at large. Nevertheless, given the nature of these public nuisances, the district court's remedy was too broad because the injunction did not clearly allow HGT to abate its infractions and/or seek authorization for its operations in a manner that could cure the public harm. In light of these holdings, we decline to order restitution of the posttrial award of attorney fees and costs to Plaintiff that HGT paid pursuant to the judgment.

{3} As to the attorney fee award, our Supreme Court has held that NMSA 1978, Section 42A-1-25 (1981) supports an attorney fee award for inverse condemnation plaintiffs, and we decline to certify the matter for reconsideration by that Court. *See Landavazo v. Sanchez*, 1990-NMSC-114, ¶¶ 26-30, 111 N.M. 137, 802 P.2d 1283 (Montgomery J., specially concurring, but delivering the opinion for the majority on this issue); *State v. Mares*, 2024-NMSC-002, ¶ 41, 543 P.3d 1198 ("[T]he Court of Appeals has the authority to depart from our precedent if our precedent does not directly control the issue in the case at bar."). Otherwise, the fee and cost awards were supported by the evidence, do not violate the Antidonation Clause, and were not an abuse of discretion. We affirm in part and reverse in part.

**BACKGROUND**

{4} The district court made extensive findings of fact in its order granting the permanent injunction, and in relation to HGT's appeal of that order, we set forth those findings to the extent they are unchallenged on appeal. *See Seipert v. Johnson*,

2

2003-NMCA-119, ¶ 26, 134 N.M. 394, 77 P.3d 298 ("An unchallenged finding of the trial court is binding on appeal."). Plaintiffs are the owners of five adjoining parcels of undeveloped land on the west side of Epazote Road in Rio Rancho, New Mexico. HGT is a grading, excavation, and building materials company that operates a portion of its business on four adjoining parcels of land, Lots 1, 13, 14, and 15[1] (the HGT Lots), located on the east side of Epazote Road. Harold Dominguez started HGT in 1975, and his adult son, Jonathan Dominguez, is currently responsible for HGT's day-to-day operations.

{5}     When HGT began its operations on the HGT Lots, the surrounding land was predominantly vacant, with the exception of the Sandoval County Landfill located across Idalia Road from Lot 1. In 1994, the City adopted E-1 or "Estate Residential District" zoning for the area, in which the principal land use is single-family dwellings. At that time, on Lot 1, HGT operated a gravel pit and removed and transported the dirt it excavated from the gravel pit to an offsite location in order to process the dirt into "engineered fill" using a piece of machinery called a "screening plant."

---

[1]HGT acquired Lot 1 in 1986, Lot 15 in 1988, and Lot 14 in 2002, and HGT leased Lot 13 from Harold Dominguez in 2010. We refer to all of these lots as "the HGT Lots" and although HGT has only used all four lots since 2010, we refer to the "HGT Lots" when activities took place on the lots that HGT used at the particular point in time.

{6}     In 1995, HGT began accepting loads of asphalt, concrete, and other "clean fill"[2] materials from outside sources in exchange for payment. Around 1999, HGT moved its screening plant from the offsite location to Lot 15 and expanded the excavation of dirt and gravel to Lot 15. HGT's screening plant continues to be located on Lot 15. In 2006, HGT entered into a lease agreement with another company, Punch, LLC (Punch), under which HGT allowed Punch to excavate on the HGT Lots and operate a rock-crushing machine on Lot 14 in exchange for royalties. Punch operated the rock-crushing machine from 2006 to 2010, after which the machine was removed from Lot 14. HGT plans to bring in another rock crusher to crush the asphalt and concrete that it has been stockpiling on the HGT Lots. Jonathan Dominguez estimated that it would take at least three—and possibly up to thirty—years to crush all of the materials that have been stockpiled on the HGT Lots since 1995.

{7}     According to Plaintiffs, HGT has excavated sand and gravel dangerously close to and into the Epazote Road right-of-way and created a cliff face by removing lateral support and causing extreme erosion along or within the right-of-way. The

---

[2]The parties do not appear to dispute on appeal that "clean fill" is defined as described in a contested exhibit: "broken concrete, brick, rock, stone, glass, reclaimed asphalt pavement or uncontaminated soil" that is "free from other solid or hazardous waste." Any materials containing more than an incidental amount of wood and vegetative matter are not considered to be "clean fill" and a solid waste permit is required for the retention of materials that do not qualify as "clean fill."

parties do not dispute that Epazote Road is a platted, dedicated public road within Rio Rancho, New Mexico. It is unpaved and unmaintained by the City. The public is not prohibited by the City from using it.

{8}     The City's appeal relates to the parties' dispute about access to Epazote Road. Plaintiffs and the City agree that in 2014, the City had begun the Idalia Road project, which "includ[ed] a plan to make Idalia Road a limited-access road." The City placed a curb and gutters along Idalia Road closing off access from Idalia Road to Epazote Road.

{9}     In 2018, Plaintiffs brought suit against HGT and the City. In 2019, Plaintiffs filed a second amended complaint, which added a statutory public nuisance claim against HGT brought under NMSA 1978, Section 30-8-8 (1963), and requested a temporary and permanent injunction "preventing HGT from continuing to operate the landfill and gravel mine." In 2020, Plaintiffs filed a motion for preliminary and permanent injunction to temporarily and permanently enjoin HGT "from operating or performing work of any kind in its unlawful, unpermitted sand and gravel mine and landfill which violates several state and local laws." After a hearing, the district court granted Plaintiffs' motion for preliminary injunction. Following a two-day bench trial on Plaintiffs' request for a permanent injunction, the district court concluded that HGT's actions resulted in public nuisances that were contrary to Section 30-8-1 and granted the permanent injunction.

**{10}** A jury heard Plaintiffs' remaining claims against (1) HGT for "trespass, conversion, public nuisance, private nuisance, and negligence";[3] and (2) the City for what is known as "inverse condemnation." Regarding the claim against the City, Plaintiffs argued that by installing the curb that eliminated access from Idalia Road to Epazote Road, "the [City] just took their properties without paying for it. [The City] damaged their access. [The City] damaged the property by removing the access, and under the jury instructions, and the law of New Mexico, that is a taking." Ultimately, the jury found that for each Plaintiff, "the City of Rio Rancho eliminated all reasonable access to any of Plaintiff's property and, as a result, took or damaged that Plaintiff's property." The district court entered judgment in favor of Plaintiffs on their damages claim for inverse condemnation against the City, under NMSA 1978, Section 42A-1-29 (1983).

**{11}** Posttrial, Plaintiffs sought attorney fees from the City, based on Section 42A-1-25(A)(3), as well as costs under Rule 1-054(D) NMRA. The City objected and argued that attorney fees were not available under Section 42A-1-25, the attorney fee request was insufficiently specific, and the requested costs were not appropriate.

---

[3]At the jury trial, Plaintiffs' nuisance claims against HGT were common law public and private nuisance claims, as opposed to the statutory public nuisance claim decided at the permanent injunction bench trial. We note that HGT objected to the sequence of the bench trial and the jury trial, but as the issue is not before us on appeal, we express no opinion about the procedure employed.

6

After a hearing, the district court granted Plaintiffs' motion and awarded attorney fees and costs. Both HGT and the City appeal.

**DISCUSSION**

{12} On appeal, HGT challenges the district court's entry of the permanent injunction, and the City contests several aspects of the district court's attorney fee and costs awards. We address HGT's appeal first.

**I.     HGT's Appeal**

{13} HGT challenges both the legal and evidentiary bases for the district court's permanent injunction order. We begin with the law and facts supporting the district court's statutory public nuisance determination and permanent injunction order before considering HGT's evidentiary arguments.

**A.     The Public Nuisances and the Permanent Injunction**

{14} Regarding the public nuisance determination, HGT raises three issues: (1) whether Plaintiffs legally and factually established that HGT created a public nuisance or nuisances; (2) whether the district court properly exercised its discretion to decide the case; and (3) whether a permanent injunction is an appropriate remedy under the circumstances. "We review the district court's findings of fact for substantial evidence, and review de novo the legal conclusions it draws from the facts." *City of Sunland Park v. Harris News, Inc.* (*Sunland Park*), 2005-NMCA-128,

¶ 38, 138 N.M. 588, 124 P.3d 566 (citation omitted). We first consider the legal underpinnings of the statutory public nuisance determination.

**1.      The District Court's Statutory Public Nuisance Determination**

{15}     It is impossible to determine whether a nuisance exists using an exact rule or formula because nuisance law "has reference to the interests invaded, to the damage or harm inflicted, and not to any particular kind of act or omission which has led to the invasion." *Moreno v. Marrs*, 1984-NMCA-077, ¶ 27, 102 N.M. 373, 695 P.2d 1322 (internal quotation marks and citation omitted), *abrogated on other grounds by Baldonado v. El Paso Nat. Gas Co.*, 2008-NMCA-010, 143 N.M. 297, 176 P.3d 286. The interests that nuisance law protects are divided into two categories: private and public. *See, e.g.*, *City of Albuquerque v. State ex rel. Vill. of Los Ranchos de Albuquerque* (*Los Ranchos I*), 1991-NMCA-015, ¶ 14, 111 N.M. 608, 808 P.2d 58. Because certain uses of property may invade public and private interests, "a nuisance may be both public and private, or mixed, where a considerable number of people suffer in the interference with their use and enjoyment of land." *Sunland Park*, 2005-NMCA-128, ¶ 41 (internal quotation marks and citation omitted). Because HGT's appeal involves only the district court's injunction arising from a statutory public nuisance, we focus on the intersection of common law and statutory public nuisance in New Mexico.

8

{16} Common law public nuisance has developed an eclectic character in New Mexico despite its seemingly simple definition as "an unreasonable interference with a right common to the general public." *State ex rel. Vill. of Los Ranchos de Albuquerque v. City of Albuquerque* (*Los Ranchos III*),[4] 1994-NMSC-126, ¶ 52, 119 N.M. 150, 889 P.2d 185 (internal quotation marks and citation omitted). The common law distinguishes between public nuisances in fact and public nuisances per se. *Sunland Park*, 2005-NMCA-128, ¶ 40. While a public nuisance in fact "becomes so" because of its circumstances, a public nuisance per se "is a nuisance at all times and under any circumstances." *Los Ranchos III*, 1994-NMSC-126, ¶ 53 (internal quotation marks and citation omitted). A violation of a municipal ordinance does not conclusively prove either nuisance in fact or nuisance per se. *Sunland Park*, 2005-NMCA-128, ¶ 46. But this Court has also explained that "whether a given use complies with controlling governmental regulations" impacts the reasonableness of the interference. *Cf. State ex rel. Baxter v. Egolf*, 1988-NMCA-047, ¶ 8, 107 N.M. 315, 757 P.2d 371 (considering "reasonableness" in the context of private nuisance); *see also* Restatement (Second) of Torts § 821B(2)(b) (1979) (listing "whether the conduct is proscribed by a statute, ordinance or administrative regulation" among

---

[4]After remand in *Los Ranchos I*, this Court decided a second appeal, *State ex rel. Vill. of Los Ranchos de Albuquerque v. City of Albuquerque* (*Los Ranchos II*), 1993-NMCA-147, 119 N.M. 169, 889 P.2d 204, before our Supreme Court took up the case in *Los Ranchos III*.

9

the "[c]ircumstances that may sustain a holding that an interference with a public right is unreasonable"). For many years, the general rule required a common law public nuisance to "affect a considerable number of people or an entire community or neighborhood." *Padilla v. Lawrence*, 1984-NMCA-064, ¶ 24, 101 N.M. 556, 685 P.2d 964. As the law developed, however, our Supreme Court expressed a broader and more nuanced view that "[i]t is not . . . necessary that the entire community be affected by a public nuisance, so long as the nuisance will interfere with those who come in contact with it in the exercise of a public right or it otherwise affects the interests of the community at large." *Los Ranchos III*, 1994-NMSC-126, ¶ 52 (internal quotation marks and citation omitted).

{17} Statutory public nuisance is governed by Section 30-8-1, which states the following:

> A public nuisance consists of knowingly creating, performing or maintaining anything affecting any number of citizens without lawful authority which is either:
>
> A. injurious to public health, safety, morals or welfare; or
>
> B. interferes with the exercise and enjoyment of public rights, including the right to use public property.

We have generally construed Section 30-8-1 as "encompassing the common law prohibitions" on public nuisance. *Titus v. City of Albuquerque*, 2011-NMCA-038, ¶ 18, 149 N.M. 556, 252 P.3d 780. Section 30-8-1, therefore, simply "identifies the consequences of knowingly committing a public nuisance," but "it does not govern

what things may constitute public nuisances. What constitutes a public nuisance is governed by common law principles." *Titus*, 2011-NMCA-038, ¶ 18 (citation omitted); *see Env't Improvement Div. v. Bloomfield Irrigation Dist.*, 1989-NMCA-049, ¶ 22, 108 N.M. 691, 778 P.2d 438 (applying the "considerable number of people" rule from *Padilla* to a statutory public nuisance claim brought under Section 30-8-1 even though the statute refers to "any number of citizens"). HGT maintains that the district court erred in concluding that HGT created a public nuisance. We disagree.

{18}   The district court issued nearly eighteen pages of findings of fact and conclusions of law relevant to its determination and expressed in several paragraphs that knowingly and without lawful authority, HGT created, performed, or maintained a public nuisance in fact. The district court's order amounts to a conclusion that HGT's activity on the HGT Lots resulted in public nuisances "because of such factors as surroundings, locality, and the manner in which it is conducted or managed." *See Los Ranchos III*, 1994-NMSC-126, ¶ 53. These findings relate to two categories of harm—harm related to Epazote Road and harm related to HGT's ongoing disregard for the legal requirements associated with its operations.

{19}   First, the district court made the following findings regarding HGT's activity with respect to Epazote Road. HGT "over-excavated at the edge of the Epazote Road

right of way and removed a portion of the right of way along most of its length," thereby creating an "unsafe condition" in the form of "a cliff face that is as much as 50' above the elevation of the HGT Lots." The district court found that HGT's actions have thus "transformed Epazote Road from a passable unmaintained road to an unmaintained road that is dangerous to the traveling public." HGT argues that these findings were not supported by sufficient admissible evidence, but as Plaintiffs explain in their answer brief, these findings were supported by the testimony of Plaintiff Wesley Bigney, Plaintiffs' expert, the City's Deputy Director of Public Works, and Plaintiffs' exhibits. And as we explain in subsequent paragraphs, the evidence supporting these findings was appropriately admitted. As a result, these factual findings alone are sufficient to affirm the district court's conclusion that HGT created a public nuisance. *See Bennett v. Nations*, 1945-NMSC-046, ¶ 17, 49 N.M. 389, 164 P.2d 1019 (endorsing the view that the public has a "right of use" with respect to public roads, even when "the road in question ha[s] been neglected and allowed to become in bad condition" (internal quotation marks omitted)).

{20} Second and equally significant are the district court's findings that HGT's operations on the HGT Lots affect and contravene the interests of the community at large. For example, the district court found:

72. The examination and oversight of operations such as HGT's by Rio Rancho and [the New Mexico Environment Department (NMED)] have the specific goals that include protecting [the] public health and safety. HGT has purposefully evaded such

12

oversight through misrepresentations, broken promises and feigned ignorance and has disregarded the public safety implications of its actions.

73. HGT has a history of failing to respond to [n]otices of [v]iolation from NMED.

74. HGT has a history of agreeing to take remedial measures and failing to fully implement the required changes.

75. HGT has a history of disregarding property lines and easements while mining, "over-excavating" and cutting in a road as part of its operations.

76. HGT's representatives have a history of misrepresenting the extent and nature of their operations to local authorities in order to evade review of the propriety of its operations.

77. Jonathan Dominguez testified regarding his understanding of HGT's legal obligations, the decision-making to disregard those obligations, and the specifics of interactions with NMED, Rio Rancho and the Plaintiffs. Mr. Dominguez consistently feigned ignorance of HGT's obligations, either at the time or now, attempted to shift blame to employees, and claimed he could not recollect key documents, meetings and decisions. The Court did not find Mr. Dominguez' testimony to be credible.

As the district court understood, the interests of the community at large are reflected in "the many layers of regulations" that "HGT has successfully evaded" during the decades it has spent "disregarding legal requirements while making excuses and claiming ignorance when enforcement is attempted." HGT contends that these findings were also not supported by admissible evidence and that "criminal acts or violations of an ordinance cannot form the basis" for an injunction. The public nuisance findings, however, are based not on the violations themselves, but on a

13

pattern of disregard for the public interest as demonstrated by knowing, repeated, and unresolved infractions. The evidence showed that despite notice of various requirements or infractions beginning in 1990, and continuing with examples in 1995, 1997, 2002, 2013, 2018, 2020, and 2021, HGT either took no action or promised to act and failed to follow through. Jonathan Dominguez testified equivocally about his knowledge of these notices, which the district court determined diminished his credibility. As we have indicated, we discuss the admissibility of the evidence in subsequent paragraphs, but at this juncture, we are satisfied that these factual findings were supported by evidence and are independently sufficient to affirm the district court's conclusion that HGT's operations constitute a public nuisance in fact by negatively affecting the interests of the community at large. *See Los Ranchos III*, 1994-NMSC-126, ¶ 52.

{21}    HGT contends that the district court's findings and conclusions do not establish statutory public nuisances as a matter of law because *Padilla* states that a public nuisance "must affect a considerable number of people or an entire community or neighborhood." 1984-NMCA-064, ¶ 24. HGT faults the district court for not making factual findings that specifically identify "whether the public at large is affected, how the public at large is affected, who is affected, or the number of people affected by any of the claimed issues." HGT quotes *Padilla*, but its argument implicitly recognizes that different standards may apply to measure whether the

14

"public" has been negatively affected by activities alleged to constitute a public nuisance. In some circumstances, "a considerable number of people or an entire community or neighborhood" must be affected in order to demonstrate a public or mixed—as opposed to a private—nuisance. *See id.* ¶¶ 13-14, 24 (concluding that odors, dust, flies, and noise were a private nuisance but that no evidence had been presented to establish that the defendant's activities "affect[ed] the rights of citizens as part of the public" and "a considerable number of people or an entire community or neighborhood"); *Sunland Park*, 2005-NMCA-128, ¶ 41 (distinguishing between private, public, and mixed nuisances based on whether the interests affected are private use and enjoyment of land or those of "a considerable number of people" (internal quotation marks and citation omitted)); *cf. Joab, Inc. v. Espinosa*, 1993-NMCA-113, ¶ 18, 116 N.M. 554, 865 P.2d 1198 (relying on *Padilla* to demonstrate the difference between a private and a public nuisance and conclude that despite testimony from nearby residents about negative effects of a landfill, the evidence did not establish a public nuisance). In other circumstances, however, the defendant's "[c]onduct does not become a public nuisance merely because it interferes with the use and enjoyment of land by a large number of persons [and t]here must be some interference with a public right." *State ex rel. Smith v. Riley*, 1997-NMCA-063, ¶ 8, 123 N.M. 453, 942 P.2d 721 (internal quotation marks and citation omitted); *see id.* (rejecting a public nuisance claim despite evidence that a considerable number of

15

people were affected because the plaintiffs did not establish interference with a public right). Along those lines, our Supreme Court recently described a public nuisance as "an unreasonable interference with a right common to the general public *that may affect any number of citizens* insofar as the nuisance will interfere with those who come in contact with it in the exercise of a public right *or* insofar as it otherwise affects the interests of the community at large." *State v. Wilson*, 2021-NMSC-022, ¶ 56, 489 P.3d 925 (emphasis added) (alteration, internal quotation marks, and citation omitted); *see id* (summarizing the *Los Ranchos III* Court's definition of a "public nuisance"). Using this standard, the district court's findings and conclusions establish that HGT's operations (1) created an unsafe condition that unreasonably interferes, or will interfere with those who come into contact with it, in the exercise and enjoyment of the public right to use Epazote Road; and (2) negatively affected the interests of the community at large by degrading the public benefits derived from the statutes, ordinances, and regulations that HGT has consistently ignored and violated.

**2. The District Court's Exercise of Jurisdiction and the Primary Jurisdiction Doctrine**

{22} Precisely because such statutes, ordinances, and regulations exist and are intended to control its operations, HGT argues that the district court should have stayed the case based on the doctrine of primary jurisdiction. Primary jurisdiction "applies where a claim is originally cognizable in the courts, and comes into play

16

whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *State ex rel. Norvell v. Ariz. Pub. Serv. Co.*, 1973-NMSC-051, ¶ 31, 85 N.M. 165, 510 P.2d 98 (internal quotation marks and citation omitted). The judicially-created primary jurisdiction doctrine is intended to promote uniformity in the regulation of matters entrusted to agencies and judicial restraint. *See Far E. Conf. v. United States*, 342 U.S. 570, 574 (1952). HGT maintains that NMED should have resolved "any noise, air quality, solid waste, surface water discharge, and surface water pollution issues" and the City should have handled "any zoning issues and building code violations." [5] Plaintiffs respond that no scientific or specialized knowledge was necessary to resolve this public nuisance claim because the equitable relief they sought was straightforward and HGT's "history of ignoring past enforcement efforts" was relevant to the district court's decision on the primary jurisdiction issue.

**{23}** Whether to recognize the doctrine of primary jurisdiction is a matter within the district court's discretion. *See State ex rel. Regents of E. N.M. Univ. v. Baca*, 2008-NMSC-047, ¶ 15 n.1, 144 N.M. 530, 189 P.3d 663; *Norvell*, 1973-NMSC-051, ¶ 34. We hold that the district court's decision to proceed with the case did not

---

[5] We assume for this opinion that any alleged zoning and building code violations could be referred under the doctrine of primary jurisdiction to the City, which is a municipality and not an administrative agency.

"exceed[] the bounds of reason, all circumstances before it being considered." *See Wright v. Atchison, Topeka & Santa Fe Ry. Co.*, 1958-NMSC-038, ¶ 28, 64 N.M. 29, 323 P.2d 286 (describing an abuse of discretion (internal quotation marks and citation omitted)).

{24}     The doctrine of primary jurisdiction has two prongs, and our attention in the present case focuses on the second. We recognize, as the district court did, that the first prong is met insofar as primary jurisdiction "applies" to this case because Plaintiffs' public nuisance claim was originally cognizable in the courts by statute. *See Norvell*, 1973-NMSC-051, ¶¶ 31, 33; *see also* § 30-8-8 (allowing "any public officer or private citizen" to bring "[a] civil action to abate a public nuisance . . . by verified complaint in the name of the state"). Thus, we focus on the second prong, which involves whether the enforcement of Plaintiffs' public nuisance claim against HGT required the resolution of issues "placed within the special competence of an administrative body" such that the judicial process should be "suspended pending referral of such issues to the administrative body for its views." *See Norvell*, 1973-NMSC-051, ¶ 31 (internal quotation marks and citations omitted).

{25}     The second prong of primary jurisdiction safeguards the "coordination between the judicial and administrative arms of government" and promotes "proper relationships between the courts and administrative agencies charged with particular regulatory duties." *Id*. (internal quotation marks and citation omitted). Whether such

18

interests are at issue depends on the nature of the claim. In *Norvell*, the attorney general, environmental groups, and a private individual sought injunctive relief to abate a public nuisance allegedly created by a power plant. *Id.* ¶ 1. The plaintiffs requested that the district court enter an order abating the power plant's emissions of particulate matter, sulphur oxides, nitrogen oxides, and mercury. *Id.* ¶ 2. Specifically, the plaintiffs sought "a mandatory injunction [to] issue requiring installation of assorted types and forms of equipment, alterations in the present mechanical makeup of the plant and fuel used, and continued monitoring and reporting procedures." *Id.* On appeal, the *Norvell* Court found it "obvious that the administrative scheme of the state . . . operates in exactly the same field as that in which plaintiffs would have the [district] court function." *Id.* ¶ 36. "[L]ittle, if anything" before our Supreme Court in *Norvell* "indicate[d] that the [a]gency ha[d] wanted for diligence or efficiency," *id.*, the Legislature intended for the agency to have primary jurisdiction, and the plaintiffs could apply to the agency for relief, *id.* ¶¶ 43-44. Thus, the *Norvell* Court concluded that judicial intervention "would add little to, or even hamper, the solution of the overall problem." *Id.* ¶ 42.

{26}    The present case does not involve the impact of specific pollutants that a single agency is tasked with regulating, but instead involves HGT's repeated failure to submit to both regulatory and municipal oversight. The evidence shows that NMED and the City made only sporadic attempts to bring HGT into compliance

19

with applicable laws, ordinances, and regulations, and unlike the record in *Norvell*, the record before us indicates a lack of diligence, efficiency, and care on the part of NMED and the City. *See id.* ¶ 36. Unlike the *Norvell* plaintiffs, Plaintiffs did not seek the installation of advanced pollution mitigation technology and continued monitoring and reporting procedures, but rather "actually ask[ed] the district court to indulge in [the] simplistic solution," *id.* ¶ 38, of permanently enjoining HGT "from operating or performing work of any kind" on the HGT Lots. Based on this view of Plaintiffs' request for injunctive relief, it is not apparent that the administrative scheme of the state operates in the same field in which Plaintiffs asked the district court to operate. *See id.* ¶ 36. The district court, therefore, did not abuse its discretion in declining to grant primary jurisdiction to NMED or the City. Rooted in this holding, however, is a necessary conclusion that the permanent injunction issued by the district court is too broad either to achieve the goal of "coordination between the judicial and administrative arms of government" or to abate the public harms HGT has caused. *See id.* ¶ 31. To explain this disconnect between harm and remedy, we consider the scope of the permanent injunction.

**3.      The Scope of the Permanent Injunction**

{27}      We review the exercise of the district court's equitable authority to fashion an appropriate remedy for abuse of discretion. *See United Properties Ltd. v. Walgreen Properties, Inc.*, 2003-NMCA-140, ¶ 7, 134 N.M. 725, 82 P.3d 535 ("[T]he issue of

20

how the district court uses its equitable powers to provide an appropriate remedy is reviewed only for abuse of discretion."). HGT contends that the injunctive relief granted is overbroad, because it does not allow HGT "to remedy the alleged harm caused to the public." We agree, because the injunction is ambiguous and the restrictions on HGT's operations are not directly related to abating the public nuisances and achieving the objectives of Section 30-8-8. *See PTA Sales, Inc. v. Retail Clerks Local No. 462*, 1981-NMSC-089, ¶¶ 13, 16, 20, 96 N.M. 581, 633 P.2d 689 (analyzing whether an injunction was designed to achieve the objectives of the statute authorizing its issuance); *Smith & Marrs, Inc. v. Osborn*, 2008-NMCA-043, ¶ 19, 143 N.M. 684, 180 P.3d 1183 (describing an abuse of discretion as a ruling that "is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case" (internal quotation marks and citation omitted)). To explain, we set forth the pertinent language of the permanent injunction.

{28}    The district court's permanent injunction included the following language in its conclusions of law:

> W. A permanent injunction should issue enjoining [HGT] from performing any industrial operations to include mining, excavating, crushing, and screening operations on [the HGT Lots].

> X. Rio Rancho may, at its discretion, allow earthwork, removal of stockpiled clean fill, and non-industrial commercial uses on [the HGT] Lots . . . by HGT, its successors or assigns to the extent that such activities comply with City of Rio Rancho Code and all other applicable statutes, regulations and engineering standards.

21

> Y. Should HGT be required to perform earthwork or to move materials in order to be in compliance with [NMED] requirements or regulations, it may take any such actions as are necessary to come into compliance.

This language is ambiguous because it is subject to multiple and potentially conflicting interpretations. First, the language does not specify whether the list of "industrial operations" that are prohibited is exhaustive or simply representative of HGT's activities on the HGT Lots. Second, at oral argument, the parties could not agree about whether HGT was only allowed to "move materials" and resume "earthwork" with proper oversight or whether other activities were also permissible if HGT sought and received appropriate permissions. Third, HGT appears to be both enjoined from and potentially allowed or possibly required to perform "earthwork" and other activities that could reasonably be considered "industrial operations." For at least these reasons, the injunction is not "so clear and certain in its terms that the defendant may readily know what [it] is restrained from doing," 43A C.J.S. *Injunctions* § 375 (2024), and could foreseeably lead to future disputes between Plaintiffs, HGT, the City, NMED, and other nonparties.

{29}     The injunction also reaches too far into regulatory and municipal oversight to effectively address the harms the injunction was meant to abate while balancing HGT's use and enjoyment of the HGT Lots. Section 30-8-8 provides a cause of action for private citizens to seek abatement of a public nuisance, and the relief afforded from that cause of action must alleviate the injury and permit proper

activities to continue. *Cf. Hase v. Summers*, 1930-NMSC-102, ¶ 5, 35 N.M. 274, 295 P. 293 (explaining in the private-nuisance context that to "remedy the nuisance" an "injunction should go merely against carrying . . . on [a business or use of property] so as to prove injurious or offensive, leaving [the] defendant the right to carry it on in a proper manner" (internal quotation marks and citation omitted)). The public nuisances that the district court found in the present case were based not on any single infraction but on years of inattention to regulatory and legal requirements that resulted in an operation that harmed the public. But the injunction nevertheless appears to limit HGT's operations entirely in some respects and prevent HGT from seeking to obtain lawful authority to continue, change, or even expand other aspects of its operations. Plaintiffs point to no evidence that HGT cannot carry on its operations at all "without causing the injuries complained of." *See id.* (internal quotation marks and citation omitted). An injunction must "not interfere with [the] defendant's use and enjoyment of his property or compel the destruction thereof further than is necessary to give [the] plaintiff the protection to which he is entitled." *Id.* (internal quotation marks and citation omitted). To the extent the injunction limits or forbids certain activities regardless of whether HGT has attempted to or has obtained official approval of those activities, the injunction is too broad. Appropriate injunctive relief must address those harms rather than individual legal infractions or specific aspects of the work performed. Otherwise, judicial relief risks running afoul

23

of the judgment that the appropriate regulatory bodies exercise and thereby disrupts the delicate coordination between the judicial and administrative arms of government. *See Norvell*, 1973-NMSC-051, ¶ 31 (explaining that the primary jurisdiction doctrine balances the functions and relationships enjoyed by the judiciary and the "administrative arms of government").

**{30}** Because we conclude that the permanent injunction in this case is both ambiguous and overbroad, we reverse and remand to the district court to modify the injunction, in relevant part, to require HGT to abide by its obligation to seek permission to carry on its business "in a proper manner" so as to abate the harms resulting from HGT's chronic oversight of the legal requirements for its operations. *See Hase*, 1930-NMSC-102, ¶ 5 (internal quotation marks and citation omitted). Next, we take up HGT's challenges to the district court's evidentiary rulings.

**B.      The Evidentiary Rulings**

**{31}** To resist the district court's public nuisance determination and injunction, HGT contests the admissibility of certain evidence presented at the preliminary and permanent injunction hearings. The parties agree that we review the admission of evidence for abuse of discretion. *See, e.g.*, *Leigh v. Vill. of Los Lunas*, 2005-NMCA-025, ¶ 19, 137 N.M. 119, 108 P.3d 525. HGT maintains that in order to support its findings of fact and conclusions of law, the district court improperly relied on (1) evidence received at the preliminary injunction hearing; (2) evidence inadmissible

24

under Rule 11-404(B) NMRA; (3) inadmissible hearsay evidence; and (4) evidence that was not admitted. We address each argument in turn.

**1.      Preliminary Injunction Hearing Evidence**

{32}     HGT asserts that at the bench trial the district court improperly relied on Rule 1-066(A)(2) NMRA to incorporate evidence that had been admitted at the preliminary injunction hearing. The disputed evidence consists of what we will refer to collectively as "the Preliminary Evidence" and includes: (1) two notices of violation sent from the City to HGT in 2018 regarding HGT's violations of various municipal ordinances (the 2018 Notices); (2) a letter sent from NMED to HGT in 1995 granting HGT conditional permission to use "clean fill" materials on one of the HGT Lots for a two-year period (the 1995 Letter); and (3) Plaintiff Wesley Bigney's testimony from the preliminary injunction hearing. Plaintiffs argue that all of the Preliminary Evidence was properly admitted at the bench trial under Rule 1-066(A)(2). With respect to the 2018 Notices and the 1995 Letter, Plaintiffs contend that HGT "invited error by proffering the exhibits" at the preliminary injunction hearing. To resolve the controversy, we consider the relevant contours of Rule 1-066(A)(2).

{33}     Rule 1-066(A)(2) is derived from Rule 65(a)(2) of the Federal Rules of Civil Procedure, *see Cook v. Klopfer*, 1974-NMSC-023, ¶ 5, 86 N.M. 111, 520 P.2d 267, and is intended to "preclude restriction of one's conduct or activities without first

giving notice and a hearing to the one to be restrained," *State v. Echols* (*In re Doe*), 1983-NMCA-025, ¶ 33, 99 N.M. 517, 660 P.2d 607. Rule 1-066(A)(2) describes two alternative processes. The first process provides for "advancement and consolidation" of a preliminary and permanent injunction proceeding, but our focus is on the second process. When advancement and consolidation is not ordered, Rule 1-066(A)(2) directs that "any evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the merits becomes part of the record on the trial and need not be repeated upon the trial." The "would be admissible" requirement is key because, as the United States Supreme Court has cautioned, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *see* 43A C.J.S. *Injunctions* § 346 (2024) (explaining that "[o]n the hearing of a motion for a preliminary injunction the rules of evidence are less strictly applied than on a final hearing, and evidence may be admissible which would not be competent in support of an application for a permanent injunction"). Thus, Rule 1-066(A)(2) strikes a balance between the parties' right to a trial or a full hearing on the merits and the public interest in judicial efficiency and economy. HGT argues that because the Preliminary Evidence was not "admissible" at the permanent injunction hearing, the

district court misapplied Rule 1-066(A)(2). As we explain, we disagree under the present circumstances.

{34}     Our review of the somewhat convoluted record relating to these exhibits shows that HGT offered or stipulated to the contested documentary exhibits at the time of the preliminary injunction hearing and was not prejudiced by the adoption of Plaintiff Wesley Bigney's preliminary injunction hearing testimony. HGT included the 2018 Notices and the 1995 Letter on its own exhibit list before the preliminary injunction hearing and explicitly stipulated to the admissibility of the 1995 Letter after Plaintiffs also proposed to use it as evidence at the preliminary injunction hearing. After it became clear at the preliminary injunction hearing that the district court intended to admit stipulated exhibits, HGT withdrew some exhibits it had offered—but not the 2018 Notices and the 1995 Letter.[6] Thus, (1) HGT waived any possible objections to the admissibility of the 2018 Notices and the 1995 Letter; and (2) by its actions before and during the preliminary injunction hearing, HGT invited any error on the part of the district court in the admission of those exhibits at the bench trial. *See Chavarria v. Fleetwood Retail Corp. of N.M.*, 2005-NMCA-082,

---

[6]HGT argues that during the remote preliminary injunction hearing, counsel experienced some communication difficulties at the time the district court admitted all stipulated exhibits. When it became clear that HGT's counsel could not be heard by the court reporter, the district court paused to resolve the impediment. On returning, HGT's counsel realized some stipulated exhibits had been admitted and asked to withdraw certain exhibits. The district court limited the admissibility of those exhibits to the preliminary injunction hearing.

¶¶ 36-39, 137 N.M. 783, 115 P.3d 799 (concluding that a party stipulated to an exhibit pretrial and thereby waived objection), *aff'd in part, rev'd in part on other grounds*, 2006-NMSC-046, ¶ 1, 140 N.M. 478, 143 P.3d 717; *McCauley v. Ray*, 1968-NMSC-194, ¶ 11, 80 N.M. 171, 453 P.2d 192 (stating that "[i]t is too well established for dispute that a party litigant may not invite error and then take advantage of it" (internal quotation marks and citation omitted)).

{35}   Nor was the balance of fairness and efficiency that Rule 1-066(A)(2) is designed to achieve disrupted by the district court's ruling that Plaintiff Wesley Bigney's preliminary injunction hearing testimony would be "part of the record of the case" at the bench trial. Plaintiff Wesley Bigney testified in court, under oath, at the preliminary injunction hearing and was subject to cross-examination by HGT. At the permanent injunction hearing, Plaintiffs asserted that the prior testimony "was placed in the record" and that they intended to cover only "new ground." The district court agreed with Plaintiffs over HGT's objections related to notice and hearsay, and Plaintiff Wesley Bigney continued to testify. HGT does not argue that the district court limited its cross-examination of Plaintiff Wesley Bigney at the bench trial. As a result, we discern no prejudice to HGT and no abuse of discretion in either of the district court's decisions regarding the admissibility of the Preliminary Evidence under Rule 1-066(A)(2) or in its reliance on the information contained therein in making its findings of fact and conclusions of law. *See Cumming v. Nielson's, Inc.*,

28

1988-NMCA-095, ¶ 28, 108 N.M. 198, 769 P.2d 732 ("[T]he complaining party on appeal must show the erroneous admission and exclusion of evidence was prejudicial in order to obtain a reversal.").

{36}    HGT maintains that the district court abused its discretion because HGT had insufficient notice that the Preliminary Evidence would be admitted at the permanent injunction hearing. The plain language of the rule, however, was sufficient to have put HGT on notice that any evidence received at the preliminary injunction hearing that would be admissible at a trial on the merits would become part of the trial record. *See Sec. & Exch. Comm'n v. N. Am. Rsch. & Dev. Corp.*, 511 F.2d 1217, 1218 (2d Cir. 1975) (rejecting the argument that appellants were denied due process by the application of Fed. R. Civ. P. 65(a)(2) because Fed. R. Civ. P. 65(a)(2) itself provided notice). HGT offers no authority holding that a district court abuses its discretion by admitting evidence at a permanent injunction hearing that was (1) stipulated at a preliminary injunction hearing or (2) in the form a party's sworn testimony from the preliminary injunction hearing when that party also testifies at the permanent injunction hearing and is subject to further cross-examination.

{37}    Instead, HGT points to (1) *Insure N.M., LLC v. McGonigle*, 2000-NMCA-018, ¶ 10, 128 N.M. 611, 995 P.2d 1053, for the proposition that a district court "may decide, after further deliberation, and the presentation of further evidence, that its prior findings and conclusions were incorrect"; and (2) *Camenisch* to argue that the

29

circumstances of the preliminary injunction hearing in this case "establish one of the prongs for not allowing preliminary injunction evidence into the trial on the merits: it was hastened and less formal." Both cases stand for general propositions about preliminary and permanent injunctions but neither require reversal of the district court's admission of evidence in the present case. In *McGonigle*, this Court held that the district court was not bound by "its previous findings based on" the evidence admitted at the preliminary hearing and "after further deliberation, and the presentation of further evidence" could come to a different resolution on the merits of issuing a permanent injunction. 2000-NMCA-018, ¶ 10. *Camenisch* does not establish a test or prongs to determine the applicability of the analogous procedure authorized by Fed. R. Civ. P 65(a)(2). *Camenisch* simply explains why "it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits." 451 U.S. at 395. The district court's admission of the Preliminary Evidence does not implicate the concerns articulated by these cases or provide a basis on which to set aside stipulations or find prejudice to HGT.

{38} Because we conclude that the district court properly exercised its discretion to admit the Preliminary Evidence under Rule 1-066(A)(2), we do not consider HGT's additional evidentiary objections to that evidence that were not raised until the permanent injunction hearing.

## 2.    Rule 11-404(B) and Evidence of Other Acts

{39}    HGT urges us to determine that the district court abused its discretion during the bench trial "when it admitted propensity evidence" that was contained in Plaintiffs' Exhibits 24 and 26 (the 2021 Exhibits). Rule 11-404(B) provides that "[e]vidence of other crimes, wrongs or bad acts is not admissible to show that an individual acted in conformity with his prior conduct." *Baum v. Orosco*, 1987-NMCA-102, ¶ 25, 106 N.M. 265, 742 P.2d 1. Other acts evidence is admissible, however, "if it is probative of a material element at issue," *State v. Soutar*, 2012-NMCA-024, ¶ 40, 272 P.3d 154 (internal quotation marks and citation omitted), and it "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 11-404(B)(2). We are satisfied that the district court did not abuse its discretion in admitting the 2021 Exhibits. *See Rabie v. Ogaki*, 1993-NMCA-096, ¶ 21, 116 N.M. 143, 860 P.2d 785 (stating that a "choice of one rational alternative over another is not an abuse of discretion").

{40}    The 2021 Exhibits were relevant and served a proper purpose. The 2021 Exhibits, introduced by Plaintiffs through the testimony of Jonathan Dominguez, include communications made in 2021 between NMED and HGT as well as accompanying documentation. Plaintiffs used the 2021 Exhibits to attempt to show that Jonathan Dominguez knew that during an NMED inspector's visit to the HGT

31

Lots in 2020, HGT allowed impermissible materials to be dumped and that HGT represented to NMED that it would remove certain material but did not. The 2021 Exhibits were not evidence of HGT's *prior* bad acts. *See Morales-Murillo v. City of Las Cruces*, A-1-CA-35478, mem. op. ¶ 10, (N.M. Ct. App. Aug. 9, 2018) (nonprecedential) (noting that evidence of a speeding citation issued *after* the subject motor vehicle accident "cannot qualify as a 'prior' bad act" under Rule 11-404(B)). The evidence of HGT's noncompliance was instead probative of the ongoing unlawfulness and the effect of HGT's operations on the public, because the regulations represent the administrative determination of what is necessary to protect the public welfare. Thus, both exhibits are probative of a material element of public nuisance and have the proper purpose to show that HGT *knew* its activities could be perceived by authorities as unlawful. We therefore discern no abuse of discretion in admitting the 2021 Exhibits.

**3. Hearsay Evidence**

{41}     HGT also argues that Plaintiffs' Exhibit 28 included inadmissible hearsay that the district court improperly admitted and relied on "to support its conclusion that HGT was a 'rogue operation.'" HGT describes Exhibit 28 as "an entire file from the NMED . . . related to an investigation of some ash from the Cochiti fire." The district court determined that Exhibit 28 was admissible under Rule 11-803(8) NMRA, the exception to the rule against hearsay for public records, which requires the proponent

of hearsay evidence to establish that the evidence is a "record or statement of a public office" that sets out "a matter observed while under a legal duty to report" or "factual findings from a legally authorized investigation." HGT argues that Plaintiffs failed to establish the necessary foundation. Plaintiffs introduced Exhibit 28 through NMED Enforcement Officer Dan Galasso, who testified that Exhibit 28 is kept in NMED's files and that it contains observations by NMED employees whose job it is to enforce the law. While this testimony is minimal, HGT has not met its burden to show that the district court abused its discretion in admitting Exhibit 28 under Rule 11-803. *See State v. Ramirez*, 1976-NMCA-101, ¶ 40, 89 N.M. 635, 556 P.2d 43 (providing that the district court is "the best judge [of] whether evidence tendered as a public record . . . meets the standards of trustworthiness and reliability which will entitle the record to stand as evidence of issuable facts"), *limited on other grounds by Sells v. State*, 1982-NMSC-125, ¶ 9, 98 N.M. 786, 653 P.2d 162.

**4. Evidence That Was Not Admitted at the Permanent Injunction Hearing**

{42} We are also unpersuaded by HGT's final evidentiary argument that the district court improperly relied on two exhibits that were not admitted at either the preliminary or the permanent injunction hearings in order "to support its conclusion that HGT sought to 'evade' the NMED and the City." We refer to these exhibits as "the Caravella Email" and "the Zoning Commission Minutes." Our review of the record demonstrates that (1) the Caravella Email was admitted at the preliminary

33

injunction hearing; and (2) the district court's reference to the contents of the Zoning Commission Minutes did not prejudice HGT.

{43} Beginning with the Caravella Email, HGT included the document on its exhibit list for the preliminary injunction hearing, and Plaintiffs stipulated to the admissibility of the Caravella Email. HGT made no request to withdraw the Caravella Email from evidence. Neither party introduced or moved to admit the Caravella Email at the bench trial. Because HGT offered the Caravella Email at the preliminary injunction hearing and drew no objection, it was "admissible" at the trial on the merits. *See* Rule 1-066(A)(2). We therefore discern no error in the district court's reference to and reliance on the Caravella Email in the findings of fact.

{44} The Zoning Commission Minutes, however, were not admitted into evidence at either hearing even though the district court referred to the contents of the exhibit in the findings of fact. Nevertheless, HGT has failed to demonstrate how it was prejudiced by any error. *See Blacker v. U-Haul Co. of N.M., Inc.*, 1992-NMCA-001, ¶ 10, 113 N.M. 542, 828 P.2d 975 ("Generalized allegations of prejudice are not sufficient to establish an abuse of discretion on the part of the [district] court." (alteration, internal quotation marks, and citation omitted)). HGT suggests this evidence was prejudicial because the district court "relied" on it "to support its conclusion that HGT sought to 'evade' NMED and the City." We disagree. The district court's conclusion that HGT generally evaded oversight was supported by

34

other properly admitted evidence, including (at least) the 2018 Notices, the 1995 Letter, and the 2021 Exhibits as well testimony about HGT's knowledge of the regulatory requirements in 1990 and 1997 and a 2013 investigation. As a result, we conclude that HGT has not met its burden on appeal to establish an abuse of discretion.

**C.      Summary of HGT's Appeal**

{45}      HGT challenged many of the district court's findings of fact based on substantial evidence and admissibility, as well as the legal basis for the district court's public nuisance findings, the exercise of discretion to address the issues raised, and the scope of the injunction issued. As we have explained, the evidence supported the findings, and the district court did not abuse its discretion in considering the evidence presented. While the scope of the injunction is overbroad, the district court appropriately determined that HGT's activities created public nuisances. Having resolved the issues presented for our review by HGT, we now take up the City's appeal.

**II.      The City's Appeal**

{46}      For its part, the City challenges the district court's posttrial award of attorney fees and costs in three respects: (1) attorney fees were not warranted under Section 42A-1-25; (2) Plaintiffs did not isolate attorney fees incurred against the City from attorney fees generated from prosecuting claims against HGT; and (3) the award of

35

costs was unjustified. This Court "review[s] an award of attorney fees for an abuse of discretion [but] our review of legal questions and the application of the law to the facts is conducted de novo." *Paz v. Tijerina*, 2007-NMCA-109, ¶ 8, 142 N.M. 391, 165 P.3d 1167 (internal quotation marks and citations omitted). We begin with the award of attorney fees under Section 42A-1-25(A)(3).

**A.      The Award of Attorney Fees Under Section 42A-1-25**

{47}      The City argues that because Plaintiffs brought an inverse condemnation proceeding under Section 42A-1-29(A), attorney fees under Section 42A-1-25(A)(3) are not available. Under Section 42A-1-29(A), a condemnee (in this case, Plaintiffs) may bring an inverse condemnation action against a condemnor (the City) who "has taken or damaged . . . any property" owned by the condemnee without paying or offering just compensation or "without instituting and prosecuting" an eminent domain proceeding. *See Moongate Water Co. v. City of Las Cruces*, 2014-NMCA-075, ¶ 7, 329 P.3d 727 (describing inverse condemnation as a type of eminent domain proceeding that occurs when "an action or eminent domain proceeding [is] initiated by the property owner (condemnee) rather than the governmental entity (condemnor)"). In relevant part, Section 42A-1-25(A)(3) states that "[t]he court shall award the condemnee [their] litigation expenses whenever . . . there is a final determination that the condemnor does not have a right to take the property sought to be acquired in the condemnation proceeding." The City maintains Plaintiffs were

not entitled to attorney fees because the claim was based "solely on a theory of inverse condemnation," and Section 42A-1-25(A)(3) does not "permit an award of attorney[] fees" unless there has been a "condemnation proceeding." Though our Supreme Court has already held to the contrary in *Landavazo*, the City maintains that this Court limited the application of *Landavazo* in *Primetime Hosp., Inc. v. City of Albuquerque* (*Primetime*), 2007-NMCA-129, ¶ 49, 142 N.M. 663, 168 P.3d 1087, *rev'd on other grounds*, 2009-NMSC-011, 146 N.M. 1, 206 P.3d 112.

{48}     In *Landavazo*, our Supreme Court interpreted Section 42A-1-25(A)(3) to permit attorney fees to be awarded in inverse condemnation proceedings. 1990-NMSC-114, ¶¶ 19, 26. The Court concluded that such a construction of Section 42A-1-25(A)(3) was necessary to serve the Legislature's purpose to "protect[] the landowner from abuse and requir[e] the condemnor to proceed by way of direct condemnation." *Landavazo*, 1990-NMSC-114, ¶ 28. Importantly, the *Landavazo* Court construed the term "does not have a right to take the property" from Section 42A-1-25(A)(3) to mean "the condemning authority has proceeded wrongfully in taking the landowner's property without paying or offering just compensation." *Landavazo*, 1990-NMSC-114, ¶ 28.

{49}     This aspect of *Landavazo*'s interpretation of Section 42A-1-25(A)(3) was at issue in *Primetime*. The question in *Primetime* was whether attorney fees under Section 42A-1-25(A)(3) were "presumptively" mandated in all inverse

37

condemnation proceedings. *Primetime*, 2007-NMCA-129, ¶ 49. This Court distinguished the *Landavazo* facts because the landowner in *Landavazo* was "literally forced" to initiate condemnation proceedings. *Primetime*, 2007-NMCA-129, ¶ 51. In *Primetime*, however, the landowner produced no evidence of "calculation or indifference" in the encroachment. *Id.* ¶ 53. This Court explained that the "aggravated circumstances" that were present in *Landavazo* were "an integral part of the decision" to award attorney fees and the lack of aggravated circumstances in *Primetime* justified not awarding attorney fees. 2007-NMCA-129, ¶ 52.

{50} The City argues that in awarding attorney fees, the district court in the present case failed to properly consider and apply *Primetime* and misconstrued both the language in Section 42A-1-25(A)(3) and *Landavazo*. The City points to the *Primetime* Court's reference to the *Landavazo* condemnor's "aggravated and objectionable conduct," *see Primetime*, 2007-NMCA-129, ¶ 51, and argues that Plaintiffs provided no evidence that the City engaged in aggravated and objectionable conduct. We agree that *Primetime* and *Landavazo* present two different inverse condemnation scenarios, but in both cases, the analyses centered on whether the particular governmental entity "proceeded wrongfully" in its decision to take the property without compensation. *Primetime*, 2007-NMCA-129, ¶¶ 50-53; *Landavazo*, 1990-NMSC-114, ¶¶ 28-29. In *Landavazo*, the county refused to consider compensation for the taking. 1990-NMSC-114, ¶ 23. And in *Primetime*, the

38

city's waterlines mistakenly encroached on the plaintiff's property. 2007-NMCA-129, ¶ 53. Reading Section 42A-1-25(A)(3), *Landavazo*, and *Primetime* together, we conclude that a district court may award attorney fees under Section 42A-1-25(A)(3) in an inverse condemnation situation if a condemning authority proceeds wrongfully in taking a landowner's property.

{51}    The present case resembles the uncompensated taking in *Landavazo* more than the misplaced waterlines in *Primetime.* The jury found that for each individual Plaintiff, "the City of Rio Rancho eliminated all reasonable access to any of Plaintiff's property and, as a result, took or damaged that Plaintiff's property." Throughout this case the City insisted that Plaintiffs had not requested access to build on their vacant lots, that the access after the curb was installed was sufficient to "get the building process started," and that the City's actions had "not eliminate[d] all reasonable access to any Plaintiff[s'] property." Instead of offering compensation or initiating a condemnation proceeding, the City essentially forced Plaintiffs to initiate an inverse condemnation proceeding to determine whether they were entitled to receive compensation for the lack of access. The jury's verdict, which the City does not challenge, therefore supported a finding that the City proceeded wrongfully when it installed the curb without compensating Plaintiffs. As a result, the district court did not abuse its discretion in awarding attorney fees pursuant to Section 42A-1-25(A)(3).

**B.**     **The Separation of Attorney Fees Incurred Against the City and Attorney Fees Incurred Against HGT**

{52}     We next consider the City's argument that because Plaintiffs' requested attorney fees included amounts incurred pursuing claims against HGT, the attorney fees awarded (1) are excessive and unreasonable; and (2) violate the Antidonation Clause. We review the district court's determination of the amount of a reasonable fee for abuse of discretion, *see Paz*, 2007-NMCA-109, ¶ 8, and evaluate constitutional questions de novo, *see Tri-State Generation & Transmission Ass'n v. D'Antonio*, 2012-NMSC-039, ¶ 11, 289 P.3d 1232. We turn to whether the district court's attorney fee award was reasonable.

**1.     The Reasonableness of the Fee Award**

{53}     The City argues that "the district court awarded Plaintiffs the entirety of their fee claim without question, having made no discernible attempt to segregate fees that could and could not be awarded against the City." Recoverable attorney fees must be separated from nonrecoverable attorney fees, and the district court "should attempt to distinguish between the two types of [attorney fees] to the extent possible." *See Dean v. Brizuela*, 2010-NMCA-076, ¶ 17, 148 N.M. 548, 238 P.3d 917 (internal quotation marks and citation omitted). It is the burden of the "attorney who seeks the attorney fee award" to show that "the work may be inextricably intertwined, making it difficult or impossible to segregate" some of the work. *Id.* ¶¶ 17-18 (internal quotation marks and citation omitted). It is the duty of the district

court to "review the claim made by [the p]laintiffs and in its discretion determine what fees to award." *Id.* ¶ 18 (internal quotation marks and citation omitted). In awarding the fee, the "award should be limited, to the extent feasible, to work related to prosecution of the complaint." *Id.* ¶ 17 (internal quotation marks and citation omitted).

{54}     Plaintiffs demonstrated that the work on the claims against HGT and the City were inextricably intertwined. In the motion for attorney fees, Plaintiffs asserted that attorney fees "associated exclusively" in litigating against HGT were not included in the attorney fee request and "[o]nly time that was exclusively for the purpose of the inverse condemnation claim and time that is inextricably intertwined with general trial time is billed." At the hearing on the motion, Plaintiffs explained that they had extracted attorney fees that only "applied to [HGT]," but they were unable to segregate the time spent at trial on the City and HGT because the City took action that supported HGT's defense—both in and out of court—that caused evidence against HGT and the City to become intertwined. The City argued that some of the separate fees were discernable. The district court disagreed and observed that the City "deferred to [HGT] throughout the case," filed pleadings that "were in support of" HGT's position, and was "involved in all the litigation." The district court found that Plaintiffs "already parsed out" attorney fees related only to HGT and that some issues related to both HGT and the City. As a result, the district court found that the

41

requested attorney fees were "reasonable and accurate, based on the materials that were provided" and that Plaintiffs were entitled to the recovery of the attorney fees sought. In the written order, the district court (1) noted that it had reviewed each of the parties' written pleadings and considered counsels' arguments; and (2) found that the amount of requested attorney fees was a "reasonable litigation expense (attorney fee) *in connection* with Plaintiffs' prosecution of the inverse condemnation claim." The district court rejected the City's arguments and applied no incorrect standard or incorrect substantive law and did not misapprehend the law. *See Aragon v. Brown*, 2003-NMCA-126, ¶ 9, 134 N.M. 459, 78 P.3d 913. We therefore discern no abuse of discretion in its determination that the attorney fees awarded were "in connection with" the inverse condemnation claim.

**2.     The Antidonation Clause**

{55}     Also related to the intertwined nature of the attorney fees, the City argues that "the award to Plaintiffs of attorney fees generated other than in litigation against the City violate[s] the [Antidonation Clause] of the New Mexico Constitution." The Antidonation Clause forbids the state, or any county, school district, or municipality in New Mexico from "directly or indirectly lend[ing] or pledg[ing] its credit or mak[ing] any donation to or in aid of any person, association or public or private corporation." N.M. Const. art. IX, § 14. The Court has defined "donation" as "a gift, an allocation or appropriation of something of value, without consideration to a

42

person, association or public or private corporation." *Vill. of Deming v. Hosdreg Co.*, 1956-NMSC-111, ¶ 36, 62 N.M. 18, 303 P.2d 920 (internal quotation marks and citation omitted). The City does not argue that the award of attorney fees only incurred against the City violates the Antidonation Clause. The City argues that "when the district court calls upon the City to pay all of the trial time—the general trial time, incurred by the Plaintiffs, who have spent more than half their time at trial litigating against [HGT], they're asking the City to finance that private litigation between private parties that did not touch any of the issues involving the City." The City suggests that if attorney time cannot be extricated in litigation with a municipality, no fees should be awarded in order to avoid an impermissible donation. We disagree that the district court's award of inextricably intertwined fees violates the Antidonation Clause.

{56}    The district court awarded fees that were "in connection with Plaintiffs' prosecution of the inverse condemnation claim." The district court did not award attorney fees to Plaintiffs that were solely related to the prosecution of the claims against HGT. As we have explained, the district court found that Plaintiffs' attorney time that was spent prosecuting the inverse condemnation claim at trial could not be separated from the time spent prosecuting the claim against HGT because the claims were either related to each other or the City's actions assisted HGT's defense of Plaintiffs' claims. The district court necessarily rejected the City's specific

43

objections to time entries, which are described in the City's brief filed in the district court. Thus, the award of inextricably intertwined fees is not a donation in either substance or effect. *See id.* ¶ 37. Nor does the City explain how an order of the court compelling a municipality to involuntarily pay fees incurred in litigation causes the City to make a donation in the sense that is prohibited by the Antidonation Clause. *See id.* ¶ 36 (defining a donation as a "gift" under N.M. Const. art. IX, § 14). We conclude that the fees for trial were inextricably intertwined and the fee award is not a gift or donation that violates the New Mexico Constitution.

## C. Impermissible Costs

**{57}** The City claims that the district court abused its discretion in awarding certain costs that were not allowed under Rule 1-054(D) and/or violated the Antidonation Clause. *See Pioneer Sav. & Tr., F.A. v. Rue*, 1989-NMSC-079, ¶ 12, 109 N.M. 228, 784 P.2d 415 (explaining that the district court has "discretion in assessing costs, and its ruling will not be disturbed on appeal unless it was an abuse of discretion"). We address the City's Rule 1-054(D) and Antidonation Clause arguments in turn.

### 1. Rule 1-054(D)

**{58}** "Costs generally are recoverable only as allowed by statute, Supreme Court rule, and case law." *H-B-S P'ship v. Aircoa Hosp. Servs., Inc.*, 2008-NMCA-013, ¶ 24, 143 N.M. 404, 176 P.3d 1136 (internal quotation marks and citation omitted). Rule 1-054(D)(2) provides a list of generally recoverable costs. Costs not expressly

44

listed in Rule 1-054(D)(2) may be awarded if the district court finds them to be "necessary and reasonable costs incurred in litigating a case," *H-B-S P'ship,* 2008-NMCA-013, ¶ 24, and the district court "explain[s] the circumstances justifying the award," *Day-Peck v. Little*, 2021-NMCA-034, ¶ 61, 493 P.3d 477 (internal quotation marks and citation omitted).

{59}   The City's challenge to the cost award generally directs this Court to review the City's objections to Plaintiffs' requested costs filed in the district court and makes few specific attacks on the district court's findings—implicit or explicit— relating to costs. This approach is contrary to the Rules of Appellate Procedure, *see* Rule 12-318(A)(4) NMRA, and as we explain, limits the appellant's opportunity for success on appeal. The cost-objection to which the City directs us was filed before the hearing on costs, at which the district court did not award many of the costs the City broadly contests on appeal and the City withdrew objections to five of the ten contested depositions. Based on the withdrawals and rulings, we do not consider the City's argument concerning these costs on appeal. The  remaining costs that the City challenged can be considered in two groups: costs that are expressly recoverable under Rule 1-054(D)(2) and costs that otherwise require a justification. *See H-B-S P'ship,* 2008-NMCA-013, ¶ 24 (explaining that "[w]hen awarding unusual items as costs, the district court should explain the circumstances justifying the award" (internal quotation marks and citation omitted)).

45

{60} Rule 1-054(D)(2) expressly permits recovery of the following costs that Plaintiffs requested: five challenged depositions, two experts, certain subpoena fees, survey costs, and filing fees. *See* Rule 1-054(D)(2)(a) (allowing recovery of filing fees); Rule 1-054(D)(2)(b) (permitting subpoena costs); Rule 1-054(D)(2)(e)(i), (iii) (allowing for deposition costs if "any part is used at trial" or "if the court determines the deposition was reasonably necessary to the litigation"); Rule 1-054(D)(2)(g) (permitting expert fees pursuant to NMSA 1978, Section 38-6-4(B) (1983) "or if the court determines that the expert witness was reasonably necessary to the litigation"); § 38-6-4(B) (limiting recoverable expert witness fees to "one expert regarding liability and one expert regarding damages *unless* the court finds that additional expert testimony was reasonably necessary to the prevailing party and the expert testimony was not cumulative" (emphasis added)); *Gurule v. Ault*, 1985-NMCA-056, ¶ 15, 103 N.M. 17, 702 P.2d 7 (permitting recovering of survey costs "where the survey was prepared for use at trial"); *see also Ulibarri v. Gee*, 1987-NMSC-113, ¶ 12, 106 N.M. 637, 748 P.2d 10 ("A separate finding of reasonable necessity [is] not required."). The district court rejected the City's arguments that these items were not used at trial, were used only against HGT, were not necessary costs, or were not "reasonably necessary to the litigation against the City." We note further, as to the filing fees, that the district court exercised its discretion to apportion the filing fees equally between HGT and the City. *Cf. Baca v. Marquez*, 1987-NMCA-

46

011, ¶ 7, 105 N.M. 762, 737 P.2d 543 (observing that in the context of comparative fault, the district courts are "under no compulsion to apportion costs on the basis of fault, yet, in exercising their discretion, they may do so if they wish"). Absent further argument on appeal explaining how the district court's rulings on the City's objections were incorrect or unsupported, the City has not demonstrated that the district court's decisions related to allowable costs under Rule 1-054(D)(2) were an abuse of discretion. *Premier Tr. of Nev., Inc. v. City of Albuquerque*, 2021-NMCA-004, ¶ 10, 482 P.3d 1261 ("[I]t is the appellant's burden to demonstrate, by providing well-supported and clear arguments, that the district court has erred.").

{61}    The City also challenges the award of costs for photocopying and gross receipts tax, which are two costs that are not explicitly listed as recoverable under Rule 1-054(D). The City argues that Plaintiff did not show that the photocopies were of exhibits that were admitted into evidence, as required by Rule 1-054(D)(2)(i), (3)(a). In granting these costs, the district court explained the unusual circumstances of the New Mexico Supreme Court emergency protocols surrounding COVID, which required everyone to have their own copy of exhibits and resulted in the district court ordering copies be provided for fourteen jurors and the court reporter. The district court also accepted Plaintiffs' position that they would be required to pay gross receipts taxes on any costs that were recovered, which justified assessing the gross receipts taxes against the City and HGT. On appeal, the City provides no

47

argument or authority to contest the district court's reasoning. *See Stanley v. N.M. Game Comm'n*, 2024-NMCA-006, ¶ 45, 539 P.3d 1224. Having determined that the district court explained its reasons for assessing both the photocopies and the gross receipts taxes, we affirm. *See H-B-S P'ship*, 2008-NMCA-013, ¶ 28 (affirming the district court's award of costs not expressly permitted in Rule 1-054(D)(2) "[b]ecause the district court affirmatively explained its reasons justifying any deviation from" the rule).

**2.     The Antidonation Clause—Costs**

{62}     The City also again relies on the Antidonation Clause to oppose some costs that the City maintains were incurred only against HGT. In the district court, the City expressly argued that three awarded costs violated the Antidonation Clause—two subpoenas, the survey of the land, and filing fees. At the hearing, the City agreed to split costs equally "unless something is clearly incurred strictly against HGT." Thereafter, the district court awarded costs that were found to be only applicable to one defendant against that defendant. Otherwise, as we have explained, the district court rejected the City's arguments that the subpoena and survey costs incurred were only related to the claims against HGT and apportioned the filing fees equally between the parties. To the extent the City's position is that the equal apportionment of filing fees has the potential to leave the City covering some costs related to HGT, the City cites no authority concluding that apportionment of costs must be exact to

48

avoid running afoul of the Antidonation Clause. Accordingly, we conclude that the cost award is not unconstitutional. *See Stanley*, 2024-NMCA-006, ¶ 45 (declining to address novel arguments absent "authoritative or persuasive" law).

**III.     CONCLUSION**

{63}     We remand for the district court to reconsider the scope of the permanent injunction. Otherwise, we affirm.

{64}     **IT IS SO ORDERED.**

_____
**KATHERINE A. WRAY, Judge**

**WE CONCUR:**

_____
**MEGAN P. DUFFY, Judge**

_____
**JANE B. YOHALEM, Judge**

49